# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

**CLERK'S OFFICE**
A TRUE COPY
Nov 30, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of )
)
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
4945 N. 42nd Street, Milwaukee, WI and Detached )
Garage; Washington person/buccal; & Washington's )
Android cellular device (See Attachments) )

Case No.

**Matter No.: 2023R00375**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A; over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A); 922 (d); 922(g)(1); and 933 | Engaging in the Business of Importing/Manufacturing/ Dealing in Firearms; Sale or Transfer of a Firearm to a Prohibited Person; Unlawful Possession or Receipt of a Firearm by a Prohibited Person; Trafficking in Firearms |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Matthew Ernst*
_____
*Applicant's signature*

SA Matthew A. Ernst, ATF
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: 11/30/2023

*William E. Duffin*
_____
*Judge's signature*

City and state: Milwaukee, WI

Hon. William E. Duffin, U.S. Magistrate Judge
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION UNDER RULE 41 FOR A
## WARRANT TO SEARCH AND SEIZE

### MATTER NO.: 2023R00375

I, Matthew Ernst, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search:

   a. The premises known as 4945 N. 42nd Street, Milwaukee, WI ("TARGET RESIDENCE");

   b. The person of Dwaine WASHINGTON (DOB 03/24/1975) to collect an oral swab or swabs of deoxyribonucleic acid (DNA) from saliva containing epithelial cells from WASHINGTON, who is presently located in the Eastern District of Wisconsin;

   c. The person of Dwaine WASHINGTON (DOB 03/24/1975) for cellphones or any electronic devices, who is presently located in the Eastern District of Wisconsin; and

   d. Cellphones or electronic devices found on WASHINGTON's person or within the TARGET RESIDENCE to include Dwaine WASHINGTON's Android cellular telephone, which is described as a touchscreen device in a dark colored phone case, which is presently located in the Eastern District of Wisconsin.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"). As such, I am "an investigator or officer charged by the Attorney General with the duty of enforcing any of the criminal, seizure, or forfeiture provisions of the laws of the United States," within the meaning of Section 3051(a) of Title 18, United States Code; that

is, an officer of the United States who is empowered by law to conduct investigations of, execute warrants and to make arrests for offenses against the United States and offenses enumerated in United States Code Title 18 and Title 21. I have been employed with the ATF since January 2015, and am currently assigned to the Milwaukee Field Office, under the Chicago Field Division. I completed Criminal Investigative Training and Special Agent Basic Training at the Federal Law Enforcement Training Center. I have received training on in connection with, and conducted investigations of violations of the National Firearms Act, Gun Control Act, and Title 18, United States Code, Sections 922(a), 922(d), 922(g), 924(c), 933, and others. I have also received training and conducted investigations involving illicit drugs and the distribution of illicit drugs in violation of Title 21, United States Code, Sections 841, 843, 846 and others.

3.     I am investigating Dwaine WASHINGTON ("WASHINGTON"), Kelvin HENRY ("HENRY"), and others known and unknown, who are suspected of violating Title 18, United States Code, Sections 922(a)(1)(A) (Engaging in the Business of Importing/ Manufacturing/Dealing in Firearms), 922(d) (Sale or Transfer of a Firearm to a Prohibited Person), 922(g)(1) (Unlawful Possession or Receipt of a Firearm by a Prohibited Person), and 933 (Trafficking in Firearms).

4.     Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving criminal gangs, controlled substances, and firearms, I know that individuals involved with and/or in criminal gangs as well as drug and firearm traffickers commonly use cellular telephones and social media platforms to facilitate their gang, drug, and firearm trafficking activities. Like most everyone else in this day and age, criminal gang members as well as drug and firearm traffickers typically have a Facebook profile and are able to access it via their computer or cellular telephone. Criminal gang members as well as drug and

2

firearm traffickers commonly maintain cellular telephones as well as social media profile(s), and sometimes allow other criminal gang members and/or drug and firearm trafficking associates to use their profile, to conduct criminal gang activity and/or drug and firearm trafficking business. Furthermore, in my experience, I have been involved in investigations where DNA analysis provided evidence of crimes and of a particular person's participation in a crime, including the packaging and manufacturing of drugs, the control of or nexus to drug premises, and the possession of firearms, ammunition, and firearms accessories.

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  Because this affidavit is being submitted for the limited purpose of establishing probable cause for a search warrant authorizing the search of the TARGET RESIDENCE, WASHINGTON'S person, and any electronic devices located at the TARGET RESIDENCE or on WASHINGTON's person as described in Attachments A1 to A3 for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts that I believe are necessary to establish probable cause to believe that the TARGET RESIDENCE, WASHINGTON'S person, and any electronic devices located at the TARGET RESIDENCE or on WASHINGTON's person contains evidence, fruits, and instrumentalities of violations of Title 18 United States Code, Sections 922(a)(1)(A) (Engaging in the Business of Importing/Manufacturing/Dealing in Firearms), 922(d) (Sale or Transfer of a Firearm to a Prohibited Person), 922(g)(1) (Unlawful Possession or Receipt of a Firearm by a Prohibited Person), and 933 (Trafficking in Firearms), as further described in Attachment B.

3

**PROBABLE CAUSE**

**Search Warrant at Dwaine Washington's Residence**

6.     On October 4, 2023, law enforcement agents executed a search warrant at the Milwaukee home of Dwaine WASHINGTON ("WASHINGTON") located at 4945 N. 42nd Street, Milwaukee, WI ("TARGET RESIDENCE") and located evidence that WASHINGTON was manufacturing privately made firearms ("PMF").

7.     In WASHINGTON's home (TARGET RESIDENCE), law enforcement recovered and/or located:

   a.   approximately nine (9) firearms (five (5) of which were PMF AR15-style pistols);

        1.   Four (4) of the AR15 pistol PMFs were all similar in make and style and were located on top of a dog kennel and in the living room.

   b.   Seven (7) PMF jigs/molds (five (5) of which were pistol jigs/molds and two (2) were AR15 jigs/molds);

   c.   drill bits, grinders, drill presses, Dremel(s) and Dremel attachments, vices, and a router

   d.   various firearm parts and accessories; and

   e.   plastic shavings from PMF jigs and/or frames/receivers also known as "swarf," and other tools in the basement.

8.     Based on training and experience, your affiant knows that a polymer 80 jig provides the builder with the tools, measurements, and physical guides for fabricating an 80% lower or frame into a working firearm. An 80% lower is an object that is nearly a lower receiver and does not yet require serialization per US Federal Law and ATF rules. Jigs are kits that can consist of

4

metal or plastic plates, bolts, drill bits, and end mill bits. Jigs are made specific to the firearm being built, whether it's an AR rifle/pistol, or a handgun, and therefore, parts and appearances may vary. Pistol jigs all use at least two side plates to secure the frame, like an AR jig does. Unlike the AR's 80% lowers, there is no solid metal cavity that needs to be milled on an 80% frame. Instead, smaller amounts of material are carved out to make room for the slide and barrel. These fabrication requirements dictate how each pistol jig is made. On polymer frames, cutting the excess material requires just a few minutes with a pair of snips. A polymer handgun jig has a simple outline built into the side plates to show the builder where to cut. The jig provides all the templates and guides for completing the frame inside. The jig has pre-drilled guide holes for the hole locations located on the side plates, and the recessed areas atop each plate indicate where to trim excess material for the slide rails. Inside, a guide shows how to shape the barrel seat. Instructions will indicate whether a builder must use a Dremel tool or cutting wheel. Jigs can also be reusable but are dependent on the material (i.e., metal or polymer). Metal jigs are considered reusable and can fabricate multiple 80% lowers and frames. Polymer jigs are considered disposable, but they can be reused if the builder is careful not to damage the jig while using it for completing a frame or lower.

9.     In total, evidence located during the October 4, 2023 search warrant at the TARGET RESIDENCE revealed that WASHINGTON received and/or had order forms from online firearm retailers for approximately sixteen (16) AR-15 5.56/.223 and/or 300 Blackout build kits, twenty-one (21) AR-15 lower receivers, two (2) PMF Glock style pistol build kits and frames, in approximately a nine (9) month period. Your affiant knows, based on training and experience, that a build kit will only allow an individual to manufacture one (1) firearm and would require purchasing a frame or lower receiver to complete the build. Your affiant believes, based solely on the observed packing slips/invoices detailed above, that WASHINGTON could have

5

manufactured/built approximately twenty-three (23) completed PMFs. It is important to note, only five (5) PMFs were recovered from WASHINGTON's residence during the execution of the state search warrant on October 4, 2023.

10.     In WASHINGTON's residence, agents located (1) an invoice from EP Armory, dated 07/19/2023, addressed to WASHINGTON, order #BTX126641, billing address; Dwaine Washington, 4945 N 42nd St, Milwaukee, WI 53209, 414-379-5631, dkwash36@gmail.com for one (1) Buy 3 get 1 free on EP80-2's with an order comment "I'd like to receive one in the sand color"; and (2) an invoice from EP Armory dated 08/08/2023, order #BTX126753, billing address; Dwaine Washington, 4945 N 42nd St, Milwaukee, WI 53209, 414-379-5631, dkwash36@gmail.com for one (1) Buy 3 get 1 free on EP80-2's with an order comment stating "I'd like to receive one in the sand color."  WASHINGTON later told your affiant that his phone number is 414-379-5631 and his email address is dkwash36@gmail.com.

11.     Also, in WASHINGTON's residence, agents located an invoice from EP Armory, a Texas based online firearm retailer. The invoice showed eight (8) AR firearm lowers were shipped to "Kevin Henry" at 4308 N. 66th Street, Milwaukee, WI 53216, 414-484-5019, and mybmw3@gmail.com.

**Dwaine Washington's Inculpatory Statements**

12.     In a statement to law enforcement on October 4, 2023, WASHINGTON admitted to receiving eight (8) EP Armory lowers, referring to unfinished 80% lowers. WASHINGTON stated that he received (8) AR style unfinished firearm lowers from a person who he declined to identify. WASHINGTON said he manufactured the AR style unfinished firearm lowers into full privately made firearms (PMFs) and provided four (4) completed PMFs to the person who supplied the eight (8) AR style unfinished firearm lowers. WASHINGTON said that he kept four (4) of the

6

PMFs that he made from these unfinished lowers for himself. Those four firearms were recovered in his residence.

13.     The following is a summary of the interview of WASHINGTON and not intended to be a verbatim account unless as indicated below through the use of direct quotes:

a. WASHINGTON stated he has worked at Purple Mountain Solutions for approximately two (2) years and just started making approximately $16.50 an hour.

b. WASHINGTON stated he has been making PMFs for approximately three (3) years and during that time, he believes he has manufactured/built approximately twenty-five (25) PMFs. WASHINGTON stated the building/manufacturing of PMF's is relaxing to him and he enjoys doing it as a hobby. WASHINGTON stated he builds AR pistols, but has also built several conventional pistol style PMFs, referring to a Glock-style PMF. WASHINGTON stated he has built PMFs for himself, as well as other individuals.  WASHINGTON also stated that he has worked on other individuals' firearms (firearms that WASHINGTON did not build), in a gunsmithing role. WASHINGTON identified the individuals he builds and gunsmiths for as being family, friends, and friends of friends. WASHINGTON stated he believed these individuals to be responsible and on the up and up, referring to being able to legally possess firearms, but did state he has dealt with individual(s) who may have been a felon, but WASHINGTON was not certain of that being a fact.

c. WASHINGTON stated when he does builds for other individuals there are times where WASHINGTON orders the parts from online firearm retailers on their behalf, has them shipped directly to his residence and builds the PMFs for them.

7

Other times, people will order the parts themselves, have the parts shipped to their own residence, and then bring the parts over for WASHINGTON to build for them.

d. WASHINGTON stated he has bartered PMF builds for other individuals as well as PMFs he has built for himself for items/services he needed and did not have the money to purchase. WASHINGTON admitted that he had lied and had built one (1) or two (2) PMFs for approximately $100.00 to $200.00 USC. WASHINGTON explained that he knew he would definitely be in trouble if he admitted to building PMFs in exchange for money. Your affiant took this statement to mean WASHINGTON knew manufacturing firearms for money was illegal. WASHINGTON did state there were occasions where he built PMFs for individuals for no exchange of money, goods, or services. Towards the end of the interview, WASHINGTON clarified that the PMF parts he had purchased and built for himself were not purchased or built with the intent to sell, barter, or trade them. WASHINGTON also indicated he has not really been able to keep any of his personal firearms due to circumstances arising where he needed to trade/barter them for parts or services.

e. WASHINGTON stated he has built approximately ten (10) AR15 pistol-style PMFs and brought them down to Crenshaw, Mississippi where his uncle, Leon PUE, resides. WASHINGTON stated he brought these ten (10) PMFs down there over time and the last time he was down there was approximately a year ago. WASHINGTON stated these ten (10) PMFs were still all at his uncle's residence. WASHINGTON stated he used these PMF's to hunt deer with on his uncle's property. WASHINGTON also stated these ten (10) PMFs do not have sights on

8

them and when he is ordering the parts to build a PMF, he never orders sights for them. When affiant asked how he was able to hunt with a firearm with no sights, WASHINGTON stated he was a good shot. When asked why he left these PMFs in Mississippi, WASHINGTON stated they were left down there because there was less of a risk of them being stolen out of his uncle's rural residence than they would be at WASHINGTON'S residence.

    f.   WASHINGTON was asked about the four (4) AR15 pistol PMFs which were recovered on top of the dog kennel and living room of WASHINGTON'S residence during the search warrant operation on October 4, 2023. WASHINGTON stated he built those four (4) PMFs the previous night and they were for his collection. WASHINGTON stated he gave money to an individual, who he was unwilling to identify, and together they purchased a total of eight (8) unfinished lowers from EP Armory. WASHINGTON stated four (4) lowers were for WASHINGTON and the other four (4) were for the unidentified individual. The unidentified individual placed the order, had them shipped to their residence, and then brought them over to WASHINGTON to build. WASHINGTON stated he believed the lowers were delivered last Thursday (referring to September 28, 2023). WASHINGTON stated the four (4) PMFs he built for the unidentified individual were picked up by the unidentified individual that morning.

14.    Affiant also asked WASHINGTON for consent to search his cellular telephone, which WASHINGTON denied. Your affiant did inquire with WASHINGTON what type of cellular telephone WASHINGTON owned and WASHINGTON stated it was an Android. For most of the interview WASHINGTON did have his cellular device concealed on his person but

9

did take the cellular telephone out during the interview allowing your affiant to observe the device and your affiant believes based on training and experience that WASHINGTON'S cellular telephone was in fact an Android device and not an Apple iPhone. Your affiant observed WASHINGTON'S cellular telephone to be a touchscreen device in a dark colored phone case. Furthermore, WASHINGTON provided his telephone number as being 414-379-5631 to your affiant.

15.　　On or about November 24, 2023, a federal search warrant, Case #: 23 MJ 223, signed on by the Honorable United States Magistrate Judge William Duffin, was served to AT&T for location, aka ping, information associated to WASHINGTON'S 414-379-5631 telephone number. After serving the warrant, AT&T advised WASHINGTON'S 414-379-5631 telephone number was currently inactive.

16.　　On or about November 27, 2023, your affiant contacted AT&T regarding WASHINGTON'S 414-379-5631 telephone number and learned the number has been inactive since October 6, 2023. Your affiant then checked to see if WASHINGTON'S telephone number had been ported, referring to the telephone number being transferred to another Service Provider, and learned WASHINGTON'S telephone number had not been ported. It is important to note, WASHINGTON'S telephone number went inactive just two (2) days after WASHINGTON was interviewed by investigators and denied consent for investigators to conduct a forensic download of his cellular device. Your affiant believes this is an attempt by WASHINGTON to thwart law enforcement from potentially recovering evidence from his cellular telephone.

17.　　Your affiant knows from training and experience, although a cellular telephone may be listed as inactive with a Service Provider it does not mean the cellular device itself will not contain data or evidence of a crime. Cellular devices, like computers, are capable of storing large

amounts of data. The storage of that data would not necessarily be effected by the device not have active service from a particular service provider. Many cellular telephone functions can be utilized through the use of internet as long as WIFI is enabled on the device. These functions include, but are not limited to, messaging/call-based applications and social media applications to include their messaging functions. Further, it is not uncommon during the course of an investigation to recover a cellular device which has not been utilized for sometime and would otherwise appear to be no longer active with a Service Provider. Through the forensic download and analysis of those devices it is common to recover data from the device. Based on the information detailed above, your affiant knows WASHINGTON was utilizing the telephone number up until October 6, 2023 and should still contain data that would be relevant to the investigation into WASHINGTON manufacturing and potentially trafficking PMFs.

18.     On or about November 27, 2023, your affiant reviewed data provided by EP Armory and observed WASHINGTON had ordered a Zombie EP80-2 on October 2, 2023. The order lists WASHINGTON as both the billed party and the intended recipient of the package. The order was shipped to the TARGET RESIDENCE on October 3, 2023 and listed tracking number 9405 5112 0620 927 9046 69 being associated to the order. The order also lists WASHINGTON's telephone number as 414-379-5631 and email as dkwash36@gmail.com. Your affiant went to EP Armory's website and observed the above-detailed item to be an unfinished AR15 lower receiver. Your affiant also queried the above-listed tracking number through USPS' website and learned the package was delivered on October 6, 2023 at approximately 0931hrs. Based on the fact this order was delivered to the TARGET RESIDENCE after law enforcements contact with WASHINGTON on October 4, 2023 this unfinished AR15 lower would not have been recovered. As a result, your

11

affiant believes PMF parts and/or a completed PMF are currently present at the TARGET RESIDENCE.

**Evidence Connecting Kelvin Henry to: (1) the Four Privately Made Firearms; (2) 2628 N. 48th Street, Milwaukee, WI; and (3) a 2014 brown Hyundai Equus sedan bearing Wisconsin license plate number ARC7738**

19. Within the same basement area where jigs and other associated items were observed inside WASHINGTON's residence, officers located an open USPS box with shipping label torn off from "Happy Bear" and a billing invoice from EP Armory dated 09/23/2023, order #BTX126966, showed a delivery going to "Kevin Henry" at 4308 N 66th Street, Milwaukee, WI 53216 for eight (8) black EP80-2 (AR-15 Lowers), telephone number 414-484-5019, and email address mybmw3@gmail.com.

20. Your affiant found that the information on this document is consistent with WASHINGTON's admission that he provided four (4) completed PMFs to the person who ordered eight (8) lowers from EP Armory that WASHINGTON believed were received on approximately September 28, 2023.

21. Your affiant was able to identify "Kevin Henry" as Kelvin HENRY ("HENRY"), DOB: 6/6/1979, who is a convicted felon. Your affiant conducted a criminal history query, through the National Crime Information Center ("NCIC"), for HENRY which resulted in identifying the following felony convictions:

   a. A June 5, 2002, Milwaukee County Circuit Court Case Number 2001CF006492 felony conviction for Manufacture/Deliver Cocaine.

   b. A November 24, 2004, Milwaukee County Circuit Court Case number 2004CF002000 felony conviction for Armed Robbery and Reckless Injury 1st Degree.

12

22.     Your affiant is aware, through a separate recent MPD criminal investigation, that "Kevin Henry" is an alias utilized by HENRY. Affiant also learned HENRY is currently on extended supervision for 1st Degree Reckless Injury and Armed Robbery with Use of Force.

23.     ATF TFO Paul Martinez contacted the Wisconsin Department of Community Corrections ("WI DOCC") and learned the following regarding HENRY'S extended supervision with WI DOCC: HENRY'S current WI DOCC address is 2628 N. 48th Street, Milwaukee, WI 53210. WI DOCC stated HENRY moved to 2628 N. 48th Street in August of 2023 and has had only one (1) home visit at this address which occurred on September 11, 2023. HENRY also has telephone number 414-484-5019 listed as his telephone number with WI DOCC. This is the same telephone number used on the EP Armory invoice, causing your affiant to further believe that HENRY is the person to whom WASHINGTON provided the completed four (4) PMFs on the morning of the search warrant.

24.     Additionally, on HENRY'S list of contacts registered with the WI DOCC, HENRY lists the address of 4308 N. 66th Street, Milwaukee, WI 53216 as being the residence of his cousin, Anthony GLENN (hereinafter "A. GLENN"), and aunt, Michelle GLENN (hereinafter "M. GLENN"). This is the address listed on the EP Armory invoice where HENRY had the eight (8) EP Armory unfinished lowers shipped. Your affiant conducted a criminal history check for A. GLENN and M. GLENN, through NCIC, and learned neither are prohibited from possessing firearms and/or ammunition. It is important to note, through a query of a law enforcement database that your affiant has used in the past and found to be reliable, that there was also an Anthony GLENN SR (hereinafter "A. GLENN SR") associated to 4308 N. 66th Street, Milwaukee, WI. A review of A. GLENN SR'S criminal history revealed a felony conviction for Aggravated

13

Battery/Intent-Bodily Harm on or about July 19, 1993, in Milwaukee County Circuit Court, Case Number F-923059.

25. Your affiant queried HENRY through the Wisconsin Circuit Court Access Page (CCAP) and learned HENRY has an open misdemeanor case in Milwaukee County for Battery Domestic Violence, case # 2023CM002110. In the "Court Record" notes, for the above-listed Milwaukee County Circuit Court case, as of August 8, 2023, HENRY lists his current residence as 4308 N. 66th Street, Milwaukee, WI 53216. Affiant also learned that HENRY had a pre-trial conference regarding this case scheduled for October 9, 2023, at 0830hrs. According to CCAP records, at no time between August 8, 2023, and October 9, 2023, did HENRY update or change his address with the court. Therefore, on the date when the eight (8) lowers were ordered from EP Armory and shipped to 4308 N. 66th Street, Milwaukee, WI, HENRY listed that same address as his address with the court. This further confirms for your affiant that HENRY is the individual who ordered the eight (8) lowers from EP Armory and, thus, is the same person to whom WASHINGTON furnished the four (4) completed PMFs.

26. Your affiant reviewed data provided by EP Armory for the purchase made by "Kevin Henry" from their online firearms retail store. Your affiant observed this was the only order made by "Kevin Henry" from EP Armory. The order was shipped on September 25, 2023, through standard shipping, to the TARGET RESIDENCE 1 and had tracking number 9405 5112 0620 9577 2532 61 associated to the order. Your affiant learned, through the United States Postal Service (hereinafter "USPS"), that a search of the above-listed tracking number through USPS's databases showed the order was delivered on October 2, 2023, at approximately 1102hrs and was "left with individual." Your affiant believes the USPS documenting HENRY'S order as being "left with individual" refers to someone at 4308 N. 66th Street, Milwaukee, WI being present when the order

14

was delivered and accepted the package from USPS. Your affiant notes that this is consistent with and corroborates WASHINGTON's admissions regarding his manufacturing and transferring of PMFs. Specifically, WASHINGTON admitted that he built the four (4) PMFs for the unidentified individual (believed by your affiant to be HENRY) prior to WASHINGTON's October 4, 2023, interview. USPS records show that the eight (8) lowers were, in fact, delivered two days before that interview and, thus, were available for WASHINGTON to use to make completed PMFs that night.

27.     WASHINGTON'S statement establishes that (1) WASHINGTON provided money to a person he declined to identify for that person to acquire unfinished 80% firearm lowers; (2) that person ordered eight (8) unfinished lowers from EP Armory; (3) that person supplied WASHINGTON with the eight (8) unfinished lowers; (4) WASHINGTON used these unfinished lowers to manufacture eight (8) PMFs; (5) WASHINGTON supplied the person who ordered the unfinished lowers with four (4) of the completed PMFs on the morning of the search warrant (October 4, 2023); and (6) the remaining four (4) PMFs were in WASHINGTON's residence. Your affiant believes WASHINGTON's statement is reliable because it was, in part, made against his penal interest, and because aspects of his statement were corroborated by independent sources. The markings on the lowers on the four (4) completed PMFs found in WASHINGTON's house bear the same markings as those listed for sale on EP Armory's website and are consistent with the model number listed on the recovered EP Armory invoice. The shipping address on the EP Armory invoice is the same address HENRY lists with the Milwaukee County Circuit Court in his open criminal case. It is also an address HENRY provided as a relative's address to the WI DOCC. Further, the phone number listed on the EP Armory invoice is the same number HENRY provided to WI DOCC. Finally, "Kevin Henry" is a known alias for HENRY. In fact, Kevin D. Henry is a

15

listed A.K.A. on CCAP records for HENRY's open Milwaukee County criminal case. Based upon all of this, your affiant believes HENRY is the unidentified individual who ordered the lowers and subsequently acquired the four (4) completed PMFs from WASHINGTON'S residence on the morning of October 4, 2023.

28.     Your affiant knows, from training and experience, that individuals like HENRY, who are convicted felons and are unable to obtain firearms through the legal gun market due to their prohibited status, are forced to rely on non-prohibited individuals to procure firearms from the legal gun market or manufacture and/or have others manufacture PMFs on their behalf. Furthermore, your affiant knows, from training and experience, prohibited persons tend to hold onto firearms they can procure for long periods of time due to their inability to obtain firearms through a legal market. Furthermore, unlike narcotics which can be consumed and/or disposed of expeditiously, firearms tend to be kept and utilized for long periods of time. As such, your affiant believes HENRY is still in possession of the four (4) AR pistols WASHINGTON built for HENRY.

29.     As previously documented, your affiant was able to identify HENRY through a separate, recent criminal investigation. Through that investigation, officers were aware HENRY drove a 2014 brown Hyundai Equus sedan bearing Wisconsin license plate number ARC7738.

30.     Your affiant queried the above-listed license plate number through law enforcement databases which revealed HENRY as being the registered owner of the vehicle and has a vehicle registration expiration date of May 31, 2024. Your affiant conducted a query of HENRY'S above-listed license plate number through a law enforcement database which collects, tracks, and stores license plate reader (LPR) hits on vehicles from law enforcement agencies and commercial companies. Your affiant has used this database in the past and found it to be reliable. The query

revealed approximately forty-seven (47) LPR hits for HENRY'S vehicle all taken between May 31, 2023 to October 8, 2023. Of those forty-seven (47) LPR hits, approximately eighteen (18) LPR hits occurred between 2616 N. 48th Street, Milwaukee, WI and 2626 N. 48th Street, Milwaukee, WI from August 7, 2023 to October 8, 2023. Affiant did not locate any LPR hits for HENRY'S vehicle at the 66th Street residence.

31.     In October of 2023, your affiant along with other investigators conducted several rounds of surveillance on the 2600 block of North 48th Street, Milwaukee, WI 53210. During each surveillance operation, investigators the 2014 brown Hyundai Equus sedan bearing Wisconsin license plate number ARC7738 approximately parked in front of duplexes located at 2634-2636 and 2628-2630 N. 48th Street, Milwaukee, WI. Specifically, on October 15, 2023, TFO Martinez observed HENRY exit the door of 2628 N. 48th Street, Milwaukee, WI, enter the driver seat of the 2014 brown Hyundai Equus, and drive away.

32.     Investigators conducted a utility check on 2628 N. 48th Street, Milwaukee, WI, which is HENRY'S WI DOCC address and the address investigators observed HENRY exiting on October 15, 2023. The purpose of the query was to see if investigators could further link HENRY to the above-listed address. As a result, investigators learned utilities for 2628 N. 48th Street, Milwaukee, WI to have been registered to Precious R. PULLEY (hereinafter "PULLEY") since August 3, 2023. Investigators are aware, from the previous investigation into HENRY, that PULLEY and HENRY have been together for many years and PULLEY was a live-in girlfriend of HENRY.

33.     On or about October 24, 2023, your affiant conducted another query of HENRY'S vehicle (2014 brown Hyundai Equus bearing Wisconsin license plate number ARC7738) through the same law enforcement database which collects, tracks, and stores license plate reader (LPR)

17

hits on vehicles from law enforcement agencies and commercial companies. Since the previous query, which was completed before the surveillance operation occurring on October 9, 2023, your affiant observed seven (7) additional LPR hits occurring between October 10, 2023, to October 24, 2023. Specifically, six (6) of these hits occurred between 2622 N. 48th Street, Milwaukee, WI to 2627 N. 48th Street, Milwaukee, WI between the dates of October 10, 2023, to October 24, 2023. This brings the total amount of LPR hits to approximately fifty-four (54) and the total amount of LPR hits in the 2600 block of N. 48th Street twenty-four (24).

34.     Based on the fact HENRY'S WI DOCC address is 2628 N. 48th Street, Milwaukee, WI, that HENRY's vehicle has numerous LPR hits in the area of 2628 N. 48th Street, Milwaukee, WI between August 2023 to the present, investigators observing HENRY exit 2628 N. 48th Street, Milwaukee, WI during a surveillance operation, and the utilities for 2628 N. 48th Street, Milwaukee, WI being registered to HENRY'S girlfriend, investigators believe HENRY is currently residing at 2628 N. 48th Street, Milwaukee, WI.

35.     Based on the facts above, the affiant believes that HENRY is having firearms parts shipped to the 4308 N. 66th Street, Milwaukee, WI to avoid detection at his residence located at 2628 N. 48th Street.

36.     The 4308 N. 66th Street, Milwaukee, WI is described as a single-story residence with red brick and white siding and a black asphalt shingled roof. The front entrance door of 4308 N. 66th Street, Milwaukee, WI is located on the Westside of the residence with a raised front patio leading to the front door which has a black metal security door and a brown interior door. The numbers "4308" are located directly to the South of the front door and are on a white placard with black numbers. The property also has a detached garage with white siding and a single-vehicle

18

garage door at the rear of the residence, connected to the rear alleyway, with the garage door entrance facing East.

37.    2628 N. 48th Street, Milwaukee, WI is described as a three-story residential duplex building with beige siding and a black asphalt shingled roof. The front entrance door of 2628 N. 48th Street, Milwaukee, WI is located on the Westside of the residence, is the Southernmost door, and has multiple steps leading to the front door which has a black metal security door and a wood interior door. The attached unit, 2630 N. 48th Street, has a separate front entrance on the Westside of the residence and is the Northern most door. Each individual residential unit has its own entrance door. The numbers "2628" are located on a brick pillar to the South of the front door and are on a white placard with black numbers.

38.    Accordingly, based upon the information contained in this affidavit and based on my training and experience, I believe there is probable cause to believe that WASHINGTON's person will contain for evidence, fruits, and instrumentalities of violations of Title 18 United States Code, Sections 922(a)(1)(A) (Engaging in the Business of Importing/Manufacturing/ Dealing in Firearms), 922(d)(Sale or Transfer of a Firearm to a Prohibited Person), 922(g)(1)(Unlawful Possession or Receipt of a Firearm by a Prohibited Person), and Title 18 United States Code, Section 933(Trafficking in Firearms), as further described in Attachment B. Furthermore, based upon your affiant's training and experience, your affiant knows criminals, to include firearms traffickers and individuals unlawfully manufacturing firearms, utilize multiple mechanisms to facilitate their criminal activity. Your affiant knows SMS/MMS, social media messenger applications, and other text message-based applications are commonly used on cellular devices and computers and employed by criminals to help facilitate their criminal activities. As referenced above, WASHINGTON is in possession of an Android cellular telephone and has an active

19

Facebook account. Based on training and experience, your affiant believes WASHINGTON will have, in his personal possession, the electronic communication hardware (cellular telephone/computer) that WASHINGTON uses to communicate with others.

39.     Your affiant believes that WASHINGTON's cellular telephone, which affiant believes will be located on WASHINGTON's person or within the TARGET RESIDENCE, will contain evidence as to (1) the phone number or other contact information for the person WASHINGTON admitted to providing the four (4) completed PMFs on or about October 4, 2023; (2) payment information (such as CashApp, Zelle, Venmo, etc.) for the payment WASHINGTON admitted making to the purchaser of the eight (8) unfinished lowers from EP Armory; (3) text or call logs between WASHINGTON and the person who ordered the eight (8) unfinished lowers from EP Armory; (4) photographs or videos of PMFs made by WASHINGTON to include the four (4) PMFs WASHINGTON admitted to providing to the person who ordered the eight (8) EP Armory unfinished lowers; (5) communications and other evidence related to the two (2) PMF transactions that WASHINGTON admitted to doing for cash; and/or (6) communications and other evidence related to the PMF sales and/or builds WASHINGTON admitted to doing in exchange for goods and/or services. Data on WASHINGTON's phone could provide either inculpatory or exculpatory evidence of HENRY's felonious possession of firearms.  For example, if WASHINGTON's phone shows that he communicated with Anthony GLENN or another resident of the 66th Street residence, and not HENRY, that would tend to show that HENRY did not possess the PMFs on October 4, 2023.

40.     The TARGET RESIDENCE is described as a two-story single-family residence, having a white aluminum siding with red trim around the windows and a red shingled roof. The numbers "4945" are displayed in a horizontal fashion above the East facing front entrance door of

20

4945 N. 42nd Street. There is also a detached two car garage located behind the target residence with the garage door facing East.

**DNA EVIDENCE**

41.     This affidavit is made in, in part, in support of a search warrant application seeking Buccal Swabs/DNA exemplars/samples from the person of Dwaine K. WASHINGTON (DOB 03/24/1975).  WASHINGTON is currently within the Eastern District of Wisconsin and will be so located when the Buccal Swabs/DNA exemplars/samples are obtained from him, pursuant to the search warrant being applied for herein.  The requested Buccal Swabs/DNA exemplars/samples will be utilized for DNA comparison purposes with evidence related to the offenses that occurred on or about October 4, 2023.

42.     As described above, several items of evidence were collected in this investigation that may contain DNA evidence from which comparisons could be made, including, but not limited to:

a.   Four (4) completed PMFs built from EP Armory lowers recovered during the execution of a search warrant at WASHINGTON's residence on October 4, 2023;

b.   EP Armory invoice for eight (8) EP Armory 80% lowers recovered during the execution of a search warrant at WASHINGTON's residence on October 4, 2023; and

c.   Firearm manufacturing equipment, i.e., the jigs, which were seized during the execution of a search warrant at WASHINGTON's residence on October 4, 2023

43.     Your affiant knows that these items of evidence (such as the four (4) PMFs recovered from WASHINGTON's residence on October 4, 2023) have been or soon will be processed for possible DNA by qualified officers or analysts.  Your affiant knows that a DNA

21

profile can be developed from items of evidence and then compared to a DNA profile from a specific target, such as WASHINGTON. In order to develop a target's DNA profile, it is necessary to obtain a sample of their saliva or blood. Affiant is requesting authorization to take buccal swabs from WASHINGTON's mouth for subsequent comparison with any DNA profiles recovered from the relevant evidence. Your affiant knows that a buccal swab can be taken in a relatively painless manner if the subject of the swab is cooperative. Your affiant also knows that DNA from WASHINGTON can be used as elimination DNA if a mixture of DNA is identified on one of the four (4) PMFs recovered from his residence. This would allow a qualified DNA analyst to draw certain conclusions about the DNA profile of the other contributor(s) to the DNA mixture.

44. Your affiant asserts that there is probable cause to believe that WASHINGTON (and, therefore, his cellular phone and DNA) is currently located within the Eastern District of Wisconsin. Specifically, WASHINGTON confirmed to affiant that he resides at 4945 N. 42nd Street in the City of Milwaukee, WI. Your affiant has no reason to believe that WASHINGTON has moved from this address since October 4, 2023.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

45. As described above and in Attachment B, this application seeks permission to search for records/evidence that might be located in the TARGET RESIDENCE and/or WASHINGTON's Android cellphone or other cellphone or computer devices found on his person in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

22

46. *Probable cause.* I submit that if a computer or storage medium is found in/on the TARGET RESIDENCE and/or WASHINGTON'S person there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

d. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

e. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

f. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

23

typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

47. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium located in/on the TARGET RESIDENCE and/or WASHINGTON'S person because:

g. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

24

h.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.

25

For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

i. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

j. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer

26

and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

k. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

l. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine

27

storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

m. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

n. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

49. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

28

50. The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

o. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

p. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

q. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a

29

facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

r. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

s. As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

t. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or

30

has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

u.   Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of the owner of the device; (2) hold the device in front of the devices owner's face and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

51.   Because WASHINGTON lives at the TARGET RESIDENCE with at least one other person (his wife), it is possible that it will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well to ensure that the items belong to the person and do not contain evidence of criminal activity, which is the subject of this search warrant.

31

*Property to be searched*

**4945 N. 42nd Street, Milwaukee, WI and Detached Garage ("TARGET RESIDENCE")**

The residence is a two-story single-family residence, having a white aluminum siding with red trim around the windows and a red shingled roof. The numbers "4945" are displayed in a horizontal fashion above the East facing front entrance door of 4945 N. 42nd Street. There is also a detached two car garage located behind the target residence with the garage door facing East.

Below is a photograph of the TARGET RESIDENCE and garage.



**ATTACHMENT A2**
*Person to be Searched*

1.      The person of Dwaine K. WASHINGTON (DOB: 3/24/1975) ("TARGET PERSON") for his salvia and DNA. The oral swab and DNA collection is to be administered by ATF SA Brendan Mulvey.

2.      The person of Dwaine K. WASHINGTON (DOB: 3/24/1975) ("TARGET PERSON") for electronic devices including, but not limited to Dwaine K. WASHINGTON's (B/M, DOB: 3/24/1975) Android cellphone (a touchscreen device with a dark colored phone case).

2

## ATTACHMENT A3

The property to be searched is described as follows:

a. Cellphones or electronic devices found on the TARGET PERSON or within the TARGET RESIDENCE to include Dwaine WASHINGTON's Android cellular telephone (a touchscreen device in a dark colored phone case).

b. This warrant authorizes the forensic examination of Cellphones or electronic devices found on the TARGET PERSON or within the TARGET RESIDENCE for the purpose of identifying the electronically stored information described in Attachment B but does not authorize the examination of any devices known to be used exclusively by an occupant of the TARGET RESIDENCE other than the TARGET PERSON.

3

**ATTACHMENT B**
**Particular Things to be Seized**

A. Dwaine K. WASHINGTON's (B/M, DOB: 3/24/1975) saliva and DNA.

B. Documents and effects that show indicia of occupancy, residency or ownership of the premises and things described in the warrant, including but not limited to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys located within the TARGET RESIDENCE;

C. Any and all records, documents, ledgers, notebooks, pay/owe sheets, receipts, transaction records, packages, conveyances, telephone statements, travel records, rental agreements, credit card statements and cellular telephone statements that shows evidence of purchasing, manufacturing, and/or trafficking of firearms;

D. Firearms of any type, silencers, machineguns, firearm parts and accessories, firearms boxes, ammunition, ammunition components, body armor, Polymer80 molds and/or jigs, and any and all documentation related to the purchase/receipt of such items including, but no limited to packaging, shipping, order forms, receipts, or other documentation located within the TARGET RESIDENCE;

E. Tools and machines, to include their parts/components, as well as any and all parts, pieces, and items used for the manufacturing of firearms located within the TARGET RESIDENCE;

F. All records and information relating to violations of Title 18, United States Code, Sections 922(a)(1)(A) (Engaging in the Business of Importing/Manufacturing/Dealing in Firearms); 922(d) (Sale or Transfer of a Firearm to a Prohibited Person); 922(g)(1)

4

(Unlawful Possession or Receipt of a Firearm by a Prohibited Person); and 933

(Trafficking in Firearms), from December 1, 2018, to the present, including but not

limited to the following:

1.     Electronic devices such as cellular telephones, laptops, computers, tablets, hard drives, etc., and all electronic storage areas on the device(s) including but not limited to text messages, digital video recordings or other areas that may contain photographs or video depictions of firearms, social media messages and content, SMS messages, iMessage data, electronic mail to include the content of the emails, and associated email addresses, IP addresses, contact information, and contact lists, location information, or other evidence of the possession, manufacture, and trafficking of firearms, to include NFA weapons, and narcotics trafficking;

For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   Evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   Evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   Evidence of the lack of such malicious software;

d.   Evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   Evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.   Evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.   Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.   Evidence of the times the COMPUTER was used;

i.   Passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.   Documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

5

k. Records of or information about Internet Protocol addresses used by the COMPUTER;

l. Records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. Contextual information necessary to understand the evidence described in this attachment;

2. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3. The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

4. The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

5. This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the ATF may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6. During the execution of the search of a device recovered from the TARGET RESIDENCE or TARGET PERSON described in Attachments A1 to A3, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

6